[837 NYS2d 49]

In the Matter of TYRONE P., a Person Alleged to be a Juvenile
Delinquent, Appellant.

First Department, May 24, 2007

## APPEARANCES OF COUNSEL

*Tamara A. Steckler, the Legal Aid Society*, New York City (*Diane Pazar* and *Willie Jones* of counsel), for appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Larry A. Sonnenshein* and *Leonard Koerner* of counsel), for presentment agency.

## OPINION OF THE COURT

FRIEDMAN, J.

Appellant's delinquency adjudication is based on testimony by two witnesses who perceived him to have been part of a group of youths that assaulted, robbed and menaced a man in Central Park. Although the identifying witnesses placed appellant in the vicinity of the complainant immediately after the attack, as the perpetrators were dispersing, neither of these witnesses testified that he actually saw appellant strike the victim, take his property, or menace him. Nor did either identifying witness testify to having seen or heard appellant act as an accessory to the wrongful acts by "solicit[ing], request[ing], command[ing], importun[ing], or intentionally aid[ing]" (Penal Law § 20.00) other individuals to engage in such conduct. Indeed, neither identifying witness specifically testified that he even noticed appellant before or during the attack. We hold that this evidence is legally insufficient to sustain the findings on which the delinquency adjudication is based.

The petition charges that, on April 21, 2005, appellant (who was then 14 years and eight months old) committed acts that, if committed by an adult, would constitute, inter alia, robbery in the second degree (Penal Law § 160.10 [1]), attempted assault in the third degree (Penal Law §§ 110.00, 120.00 [1]), and menacing in the third degree (Penal Law § 120.15). The petition was supported by the written deposition of the complainant, which stated:

"I was jogging at [East Drive and 108th Street (Har-

lem Meer), in Central Park, at 8:20 p.m. on April 21, 2005]. A group of approximately 6 black youths (which included [appellant]) attacked me. I was repeatedly punched and kicked by this entire group. I fell to the ground as a result and they continued to attack me. One of the group demanded that I give up my IPOD. That same youth removed my IPOD from my person. The group ran off together. Just as they were fleeing, another one of the group ripped the headphones to my IPOD from my ears as he ran off with the group. During this entire incident, I was in fear for my safety. I suffered injuries in that that [*sic*] body was bruised and sore and I had a black eye and a small cut under my eye."

At the fact-finding hearing, the complainant testified that, at 8:20 P.M. on the date of the incident, he was running for exercise around the loop in Central Park. He had an iPod music-playing device tucked inside the sleeve of his sweatshirt and was wearing wrap-around headphones. While running northbound in the Harlem Meer area, he saw a group of "between six and ten" black teenage boys ahead of him, who appeared to be taunting a passing cyclist. When the complainant caught up to the group, someone hit him on the left side of his face next to his eye with what felt like a fist. He stopped and asked the group of boys, "What was that for?" At that point, a second youth pushed him and punched him on the left side of his face, and then the other boys surrounded him and also began pushing and punching. He fell to the ground and tried to cover himself for protection. He heard the boys talking and yelling among themselves, but could not make out what was being said. Eventually, a member of the group said, "Give me your iPod," and yanked it out of his hand. The group then dispersed; as they did so, one boy "ripped the headphones" from him.

In his hearing testimony (and notwithstanding what appears in his written deposition attached to the petition), the complainant did not identify appellant as one of the attackers, and, indeed, made no reference to him at all. The presentment agency therefore sought to prove appellant's participation in the attack through the testimony of two other witnesses, to whom we will refer by their respective initials, "RA" and "JR."

RA testified that he was bicycling on the loop around Central Park on the evening of April 21, 2005. As he passed near Harlem Meer on his laps, he noticed a group of about 15 black or

"dark Hispanic" teenage boys who were harassing and taunting runners. At one point, the youths tried to block RA, but he was able to maneuver his bicycle around them. RA believed he was seeing the same group each time he passed, since he recognized one boy who was there on each lap. He also testified that, besides the group of boys, there were "a lot" of people in the area; in fact, he said that it was "a fairly active night in the park."

At about 8:15 P.M., on his fourth lap, RA stopped near the group of boys because he was concerned for the safety of a friend and fellow cyclist who was repairing a tire. While with his friend, RA saw the complainant "running by that group of kids," whereupon "one [of the] kids . . . punched him behind the head. Then basically collectively all the kids came in and basically took a cheap shot. I mean, it wasn't like one hit him . . . , they all hit him. He was on the ground." RA later elaborated that he "saw every kid take a punch at [the complainant] or kick [him], a cheap shot, while he was on the ground," and that "the entire group of kids jumped in like a pack of dogs." He saw one of the youths "grab the iPod away from [the complainant]," and then "the group disbanded in different directions."

As the youths were dispersing, RA "went basically to try to get one of these kids, or at least I was on the phone dialing 911, trying to basically follow a couple of these kids to see if we could apprehend one or two of them." He "exited out of the north end of the park, approximately 110th Street and Lenox Avenue, where an couple [sic] of the youths had gone." RA followed the two youths "to the projects on 112th Street," where he met JR, another person who witnessed the incident. RA ceased following the two youths at that point, but JR continued to do so.

RA identified appellant as "one of the two youths that I followed on Lenox Avenue." Upon being asked on cross-examination "[w]hen" and "where" he saw appellant, however, he responded, "I don't know what this gentleman, what this gentleman did here." Further, RA never testified that he recalled seeing appellant among the group of youths before the attack or while the attack was in progress.

JR testified on direct examination that he saw a group of "eight or ten" black and Hispanic youths attack the complainant. He said that "all" of the boys in the group participated in the attack and then "ran" away, except for "two [who] stayed

behind walking."* JR followed the two "walking" youths out of the park to a community center. At the community center, JR pointed out one of the youths to a police officer as a participant in the attack. JR identified appellant as the youth he had followed from the scene of the attack and pointed out to the police.

On cross-examination, when asked what he had seen appellant do, JR answered that appellant "was also in the group, and he was one of the last ones that started to leave the scene." When asked "where was [appellant] standing in relation to [the complainant] when you first saw him," JR testified that appellant "was in the group, all of them were surrounding [the complainant] and he was one of the last ones I saw standing beside [him]," after which appellant walked away. JR also testified that there were "a lot" of people jogging in the park at the time of the incident.

Like RA, JR never testified that he saw or heard appellant do or say anything during the attack. Further, although JR seemed to indicate on direct examination that he had seen the attack itself, he completely undermined this implication on cross-examination. Specifically, he clarified, in response to questioning by appellant's counsel, that he "did not see" the complainant being beaten, but, rather, that "when I arrived to where he was, I saw that he had been beaten."

Appellant did not present a case at the fact-finding hearing. In summation, his counsel asked that the petition be dismissed on the ground that there was

> "no proof, beyond a reasonable doubt, that my client participated in any assault or any robbery of [the complainant]. The only evidence we have is that my client was there, but being there does not mean he participated; does not mean he committed any of the acts . . . for which he is charged."

Family Court was not persuaded. The court determined, based on the testimony of the complainant, RA and JR, which it found credible, that appellant had committed acts that, if committed by an adult, would constitute robbery in the second degree, attempted assault in the third degree, and menacing in the third degree. A final order of disposition adjudicating appellant a juvenile delinquent was entered on or about December 1, 2005. We now reverse and dismiss the petition.

---

* As noted below, on cross-examination, JR clarified that he did not actually see the attack on the complainant.

We do not question Family Court's positive assessment of the credibility of the presentment agency's witnesses. The difficulty is that such testimony, even when fully credited and viewed in the light most favorable to the presentment agency, cannot sustain Family Court's findings that appellant committed the acts with which he was charged. We recognize, of course, that there was ample proof that the complainant was assaulted, robbed and menaced by a group of teenage boys, and that RA and JR testified that "all" of the boys they perceived to be part of the group took part in the assault. This, however, begs the question of who is to be included in the word "all." On this score, the presentment agency failed to offer evidence that appellant either participated in the wrongdoing or had been an accessory to it. Again, neither RA nor JR claimed to have seen or heard this particular appellant assaulting, robbing or menacing the complainant, or acting as an accessory to such conduct by "solicit[ing], request[ing], command[ing], importun[ing], or intentionally aid[ing]" it (Penal Law § 20.00). As RA admitted with regard to appellant, "To be honest, I don't know what this gentleman . . . did here." For his part, JR ultimately admitted that he had not seen the actual beating at all. Upon scrutiny of the testimony of RA and JR, what emerges is that, at best for the presentment agency, all that was proven was that appellant was present near the prone complainant as the youths who had attacked him were dispersing.

While it might be inferred from appellant's presence at the scene immediately after the attack that he may have been one of the perpetrators, in this case, any such inference falls short of proof beyond a reasonable doubt (*see People v La Belle*, 18 NY2d 405, 411 [1966] [circumstantial evidence "placing the defendant at the scene of the crime," inter alia, was insufficient to support his conviction for premeditated murder based on killing perpetrated by his brother]). In this regard, it should be borne in mind that the attack was carried out by multiple individuals in a public area where a considerable number of people were present. Thus, the testimony by RA and JR that "all" members of the group of youths took part in the attack was necessarily based on a judgment concerning which individuals were part of the group. Moreover, the witnesses gave widely differing estimates of the number of youths that made up the group; the complainant's estimate was from 6 to 10, RA's estimate was 15, and JR's was 8 to 10. We recognize that these discrepancies would be irrelevant if a witness had definitively testified to hav-

ing seen appellant acting with the group, whatever its size. As appellant argues, however, in this case it may well be that the disparity in the witnesses' estimates of the number of perpetrators arises from the fact that each witness made his own assumption about who was part of the group that committed the assault. Further doubt is cast on appellant's involvement by the testimony that he walked away from the scene, unlike all but one of the other youths, who ran.

We note that our disposition of this appeal is consistent with recent Appellate Division decisions reversing delinquency adjudications similarly based upon a weak inference of guilt from the appellant's "mere presence in the vicinity of the crime" (*Matter of Tyquan N.*, 25 AD3d 502, 503 [2006] [robbery finding reversed where "evidence established only that before and after the incident appellant and another were in the company of the person who robbed the victim," and "no evidence was adduced that appellant 'solicit(ed), request(ed), command(ed), importune(d), or intentionally aid(ed)' . . . the commission of the crime"]; *see also Matter of Derrick McM.*, 23 AD3d 474, 475 [2005] [robbery finding reversed where "the presentment agency failed to adduce legally sufficient evidence that the appellant was anything more than a bystander at the scene of a robbery perpetrated by several other individuals," given that "the complainant was unable to identify the appellant and the eyewitness was unable to attribute any culpable behavior" to him]; *Matter of Lamar McL.*, 19 AD3d 234, 234, 235 [2005] ["(t)hat appellant ran toward complainant during or after the attack (by another youth) is insufficient to prove an intent to assist in the commission of any criminal act," since appellant "did not take any action or make any threats against the complainant, or even speak to him"]).

In sum, on this record, the inferential thread connecting appellant to the attack is too weak to support a finding that guilt of any of the wrongful acts charged has been proved beyond a reasonable doubt. While there may be some reason to suspect appellant of involvement, suspicion does not equal proof beyond a reasonable doubt. We recognize, of course, the difficulties faced by law enforcement agencies in prosecuting individuals for crimes allegedly committed as part of a group, but such difficulties cannot excuse a failure to prove the culpability of the particular individual charged.

Accordingly, the final order of disposition of Family Court, New York County (Susan R. Larabee, J.), entered on or about

December 1, 2005, which adjudicated appellant a juvenile delinquent, based on a fact-finding determination, rendered November 22, 2005, that he committed acts which, if committed by an adult, would constitute robbery in the second degree, attempted assault in the third degree, and menacing in the third degree, and placed him on probation for 18 months, with the directive that he perform 100 hours of community service, should be reversed, on the law, without costs, and the petition dismissed.

MAZZARELLI, J.P., ANDRIAS, GONZALEZ and CATTERSON, JJ., concur.

Order of disposition, Family Court, New York County, entered on or about December 1, 2005, reversed, on the law, without costs, and the petition dismissed.